IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION

GEORGIOS Y. LAZAROU, Ph.D.                                        PLAINTIFF

v.                                        CIVIL ACTION NO. 1:07-CV-00060-GHD-DAS

MISSISSIPPI STATE UNIVERSITY AND
BOARD OF TRUSTEES, INSTITUTIONS OF HIGHER LEARNING          DEFENDANTS

MEMORANDUM OPINION GRANTING
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND
DENYING PARTIES' JOINT MOTION FOR EXTENSION OF TIME AS MOOT

Presently before the Court is Defendants' motion for summary judgment [141] on
Plaintiff's Title VII claim, as well as the parties' joint motion for extension of time to submit
disputes regarding deposition designations [165]. Upon due consideration, the Court finds
Defendants' motion for summary judgment should be granted, and the parties' joint motion for
extension of time should be denied as moot.

*A. Factual and Procedural Background*

In August of 2000, Mississippi State University ("MSU") and the Board of Trustees of
State Institutions of Higher Learning (the "Board") hired Plaintiff Georgios Y. Lazarou, Ph.D.
("Plaintiff"), a Cypress native, as a tenure-track, assistant professor in its Department of
Electrical and Computer Engineering. In this capacity, Plaintiff worked under a series of one-
year employment contracts. In the fall of 2005, in Plaintiff's sixth year of employment at MSU,
he applied for tenure and promotion.

Before a tenure-track faculty member may apply for tenure at MSU, he or she must
complete a five-to-six-year probationary period and satisfy certain academic requirements, which
are listed in the Faculty Handbook. During the faculty member's probationary period, he or she

undergoes annual reviews. When the faculty member is eligible to apply for tenure, he or she submits a tenure and promotion application with supporting documents for review.

When evaluating a candidate for tenure, reviewers at MSU consider three categories of performance—teaching, research or creative activity (depending on the discipline), and service. Additionally, reviewers consider whether the applicant is excelling in at least one of the three areas of performance.[1] To receive tenure, the applicant must demonstrate satisfactory performance in teaching, research, and service, and excellence in at least one area.

The tenure process at MSU is multi-tiered, and reviews at every level are considered in the final decision. *See* MSU Policies & Procedures [141-2] at 14–17.[2] First, elected, tenured faculty members in the tenure applicant's own department sit as a committee to review[3] the application and make a recommendation. Second, the department head conducts a review of the application and then makes a recommendation, followed by the college tenure and promotion committee's review and recommendation, and the college dean's review and recommendation. Next, the provost of MSU reviews all the evaluations and makes a recommendation to the president of MSU, who ultimately decides whether to recommend the candidate to the Board for tenure. If the president recommends tenure, the matter is forwarded to the Board for approval. If the president does not recommend tenure, the candidate may appeal the denial by submitting a request to the provost.

---

[1] "Attainment of tenure at [MSU] is by no means automatic, based on years of service, but is the result of a thorough evaluation of a faculty member's performance in teaching, research and/or creative achievement, and service. The proportions of these activities will vary by discipline. Excellence in one area and satisfactory performance in the others are needed to qualify a faculty member for tenure." MSU Policies & Procedures [141-2] at 5.

[2] The tenure review process detailed in this opinion was the one in place at MSU at the time Plaintiff applied for tenure.

[3] Part of the review process at this tier entails soliciting recommendations from external reviewers in the applicant's field of study.

2

If the candidate appeals the decision, the University Committee on Promotion and Tenure conducts hearings and interviews with the tenure applicant and the parties involved in the tenure review process and then forwards its recommendation to the provost. The provost subsequently forwards the committee's recommendation and his own second recommendation to the president for action. The president acts upon the appeal. If the president recommends tenure, the matter is forwarded to the Board for approval of the grant of tenure. If the president declines to recommend tenure, the appeal is final, absent the applicant's appeal to the Board. Each level of review is independent of the others, and no reviewer is bound by the others' recommendations. Upon a final decision to deny tenure to an applicant, MSU provides the unsuccessful applicant with a terminal, one-year employment contract, after which his employment contract will not be renewed.

In the case *sub judice*, after Plaintiff filed his application for tenure and promotion, the Department of Electrical and Computer Engineering Promotion and Tenure Committee reviewed his request and voted unanimously against recommending him for tenure and promotion. *See* Dep't Committee Recommendation [141-4] at 44. Thereafter, the head of the department, the college committee, the dean, and the provost successively reviewed Plaintiff's application and similarly did not recommend him for tenure; thereafter, the president likewise did not recommend Plaintiff for tenure. *See* Recommendations [141-6—141-10].

Plaintiff sought administrative reconsideration of the decision to deny him tenure. His appeal was reviewed by the University Committee on Tenure and Review. Defendants contend that this committee also conducted an investigation into the matter, including interviews of Plaintiff and others involved in the tenure process, Defs.' Mem. Br. Supp. MSJ [143] at 8; Plaintiff argues "there was no investigation whatsoever," Pl.'s Mem. Br. Supp. Resp. to Defs.'

3

MSJ [149] at 1. Upon review, the university committee, the provost, and the president declined to recommend Plaintiff for tenure. MSU maintains that although Plaintiff had demonstrated satisfactory achievement in the areas of teaching and service, he had failed to demonstrate a research record sufficient for an award of tenure, particularly with respect to publishing and obtaining competitive research grants. Plaintiff argues that the decision to deny tenure was not based on Plaintiff's qualifications, but on his race and national origin.

Plaintiff did not appeal the decision to the Board.[4] Plaintiff signed a one-year, nonrenewable contract for the 2006–2007 school year, and then filed an EEOC charge wherein he alleged that he was denied tenure for discriminatory reasons. Plaintiff resigned from his position in January of 2007. Upon receipt of his right-to-sue letter from the EEOC, he filed this suit against MSU and the Board (collectively, "Defendants") claiming he was unlawfully denied tenure and discriminated against due to his race and national origin in violation of Title VII.[5] Plaintiff appears to base his Title VII claim on four main allegations: (1) that his former department head, Dr. James C. Harden, made a discriminatory statement to him; (2) that Plaintiff was not granted tenure even though his qualifications met or exceeded those of other tenure applicants who were granted tenure; (3) that factions existed in Plaintiff's department that caused Plaintiff to suffer discrimination; and (4) that MSU failed to apply its anti-discrimination policies and procedures in reaching the tenure decision including conducting an investigation into Plaintiff's allegations of discrimination.

---

[4] The Court notes that the Board is entitled to summary judgment because it had no involvement in the circumstances of this case. The Board was not a party to the tenure review process, nor did Plaintiff appeal the tenure decision to the Board.

[5] Plaintiff also asserted a state law breach of contract claim that was subsequently dismissed on Eleventh Amendment immunity grounds. *See* Order [111] and Mem. Op. [112] Granting Defendants' Motion to Dismiss.

On November 14, 2012, Defendants filed the present motion for summary judgment [141] on the Title VII claim. Plaintiff filed a response, and Defendants filed a reply. The matter is now ripe for review.

## B. Legal Standards

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). *See* FED. R. CIV. P. 56(a); *Weaver v. CCA Indus., Inc.*, 529 F.3d 335, 339 (5th Cir. 2008). The rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322, 106 S. Ct. 2548.

The party moving for summary judgment bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record it believes demonstrate the absence of a genuine dispute of material fact. *Id.* at 323, 106 S. Ct. 2548. Under Rule 56(a), the burden then shifts to the nonmovant to "go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Id.* at 324, 106 S. Ct. 2548; *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir. 2001); *Willis v. Roche Biomedical Labs., Inc.*, 61 F.3d 313, 315 (5th Cir. 1995).

Where, as here, the parties dispute the facts, the Court must view the facts and draw reasonable inferences in the light most favorable to the plaintiff. *Scott v. Harris*, 550 U.S. 372,

378, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007) (internal citations omitted). "However, a nonmovant may not overcome the summary judgment standard with conclusional allegations, unsupported assertions, or presentation of only a scintilla of evidence." *McClure v. Boles*, No. 11–41345, 2012 WL 5285103, at *1 (5th Cir. Oct. 26, 2012) (per curiam) (citing *Hathaway v. Bazany*, 507 F.3d 312, 319 (5th Cir. 2007)).

Plaintiff claims Defendants wrongfully denied him tenure due to his race and national origin in violation of Title VII. The Fifth Circuit has noted:

> Other circuits have recognized that tenure decisions in colleges and universities involve considerations that set them apart from other kinds of employment decisions. Those factors are: (1) tenure contracts require unusual commitments as to time and collegial relationships, (2) academic tenure decisions are often non-competitive, (3) tenure decisions are usually highly decentralized, (4) the number of factors considered in tenure decisions is quite extensive, and (5) tenure decisions are a source of unusually great disagreement.

*Tanik v. So. Methodist Univ.*, 116 F.3d 775, 776 (5th Cir. 1997) (internal footnotes omitted) (citing *Zahorik v. Cornell Univ.*, 729 F.2d 85, 92–93 (2d Cir. 1984); *Kumar v. Univ. of Mass.*, 774 F.2d 1, 11 (1st Cir. 1985)). Although tenure decisions may be unique employment decisions, they do not exempt an employer from judicial scrutiny under Title VII. *Id.*

Under Title VII, it is unlawful "for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "The language of Title VII makes plain the purpose of Congress to assure equality of employment opportunities and to eliminate those discriminatory practices and devices which have fostered racially stratified job

environments to the disadvantage of minority citizens." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

Intentional discrimination can be proven by either direct or circumstantial evidence. *Crawford v. U.S. Dep't of Homeland Sec.*, 245 F. App'x 369, 378 (5th Cir. 2007) (citing *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000)). Direct evidence "must, if believed, prove the fact in question without inference or presumption." *Id.* (citing *Fabela v. Socorro Indep. Sch. Dist.*, 329 F.3d 409, 415 (5th Cir. 2003) (citations omitted)).

When there is no direct evidence of unlawful discrimination, this Court is bound to follow the *McDonnell Douglas* framework to determine whether the plaintiff has a Title VII discrimination claim. *See Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004). Under the *McDonnell Douglas* framework:

> the plaintiff must first demonstrate a prima facie case of discrimination; the defendant then must articulate a legitimate, non-discriminatory reason for its decision to terminate the plaintiff; and, if the defendant meets its burden of production, the plaintiff must then offer sufficient evidence to create a genuine [dispute] of material fact that either (1) the employer's reason is a pretext or (2) that the employer's reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic[.]

*Burrell v. Dr Pepper/Seven Up Bottling Grp., Inc.*, 482 F.3d 408, 411–12 (5th Cir. 2007) (internal quotation marks omitted); *see Rachid*, 376 F.3d at 312 (citing *McDonnell Douglas*, 411 U.S. 792, 93 S. Ct. 1817). Even in *McDonnell Douglas*'s burden-shifting framework, the ultimate burden remains with the plaintiff. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)).

## C. Analysis and Discussion

Plaintiff alleges that MSU unlawfully denied him tenure based on his race and national origin and argues in support that a comment made to him amounts to direct evidence of discrimination, or alternatively, that he has presented sufficient indirect evidence of discrimination to satisfy the *McDonnell Douglas* framework.

### 1. Direct Evidence

First, Plaintiff argues that a comment made to him by Dr. James C. Harden, Plaintiff's former department head and a reviewer of his tenure application, amounts to direct evidence of discrimination. Plaintiff alleges that Dr. Harden commented to Plaintiff during a conversation concerning his ability and/or willingness to work with others in his department: "Maybe you have character issues because of your background," Pl.'s Compl. [1] ¶ 8, and that this alleged comment was an attack on Plaintiff's ethnicity because Plaintiff "has no relevant background issues, other than his national origin." *See id.*; Pl.'s Dep. [142] at 18. Dr. Harden denies making this statement. *See* Harden Dep. [142-7] at 2.

The Court finds that Plaintiff's argument is not persuasive; this alleged comment does not constitute direct evidence of discrimination. The Fifth Circuit has indicated that "in order for comments in the workplace to provide sufficient evidence of discrimination, they must be '1) related [to the protected class of persons of which the plaintiff is a member]; 2) proximate in time to the terminations; 3) made by an individual with authority over the employment decision at issue; and 4) related to the employment decision at issue.' " *Brown v. CSC Logic, Inc.*, 82 F.3d 651, 655 (5th Cir. 1996). As Defendants argue, Plaintiff has not shown that the alleged comment was made in the context of the tenure and promotion process. It is undisputed that this comment, if made at all, was made prior to Plaintiff's submission of his application for tenure.

The alleged comment also was not made by an individual with authority over the employment decision, as the department head was but one reviewer in the multi-tiered tenure review process and did not participate in the ultimate decision to deny Plaintiff tenure. *See Krystek v. Univ. of So. Miss.*, 164 F.3d 251, 256 (5th Cir. 1999). Finally, the alleged comment does not clearly relate to Plaintiff's national origin, and Plaintiff has not shown how the alleged comment indicates that Dr. Harden sought to enforce a different standard for faculty members of non-American origin, or that such a policy was ever in place at MSU. Overall, the comment is at best characterized as a stray remark in the workplace, and as such, does not constitute direct evidence of discrimination. *See Brown*, 82 F.3d at 655.[6]

### 2. McDonnell Douglas Framework

### a. Prima Facie Case of Discrimination

To establish that a denial of tenure amounts to discrimination, "[t]he plaintiff must show that: (1) he belongs to a protected group, (2) he was qualified for tenure, and (3) he was denied tenure in circumstances permitting an inference of discrimination." *Krystek*, 164 F.3d at 257 (quoting *Tanik*, 116 F.3d at 775). "To prove a prima facie case, a plaintiff may be able to show 'departures from procedural regularity', 'conventional evidence of bias on the part of individuals involved', or that the plaintiff is found to be qualified for tenure by 'some significant portion of the departmental faculty, referrants[,] or other scholars in the particular field'." *Tanik*, 116 F.3d at 776 (quoting *Zahorik*, 729 F.3d at 93–94).

---

[6] The Court notes that Plaintiff also claims that Dr. Harden discriminated against others based on their looks. Plaintiff testified in his deposition that Dr. Harden "doesn't like not good-looking people" and Plaintiff expressed his belief that "[he] and [Dr. Yul] Chu [were] considered not good-looking people and short people." Pl.'s Dep. [148-1] at 66. Plaintiff additionally testifies that Dr. Harden expressed to him that a candidate for the faculty was "not good looking, but a very good teacher" and that in Plaintiff's view Harden "was always hiring very good-looking students to be secretaries . . . in the department." *Id.* at 65–66. The Court finds that these allegations are not pertinent to the Title VII claim, as Plaintiff has presented nothing to connect them in any way to the alleged discriminatory activity.

9

Neither party disputes that Plaintiff was in a protected group or that he was denied tenure. However, Defendants contend that Plaintiff was not qualified for tenure, and that Plaintiff has failed to show that he was denied tenure in circumstances permitting an inference of discrimination.

Plaintiff maintains that he met all the qualifications for tenure, had favorable annual reviews, favorable external evaluations, and favorable endorsements, but despite this, was denied tenure in circumstances permitting an inference of discrimination. A faculty member is qualified for tenure at MSU if he or she is (1) hired into a tenure-track faculty position; (2) satisfies a years of service requirement; (3) demonstrates satisfactory performance in teaching, research, and service, and excellence in at least one area; and (4) submits an application for tenure and promotion. MSU Policies & Procedures [141-2] at 5. The parties agree that Plaintiff was hired into a tenure-track faculty position, satisfied his years of service requirement, and demonstrated satisfactory performance in teaching and service. However, the parties dispute whether Plaintiff demonstrated satisfactory performance in research, and excellence in at least one area of review.

Defendants contend that to demonstrate excellence in research, a tenure applicant must show that his or her research program is developing a national reputation and that Plaintiff failed to do this. In making this determination, Defendants maintain that reviewers considered the number and nature of Plaintiff's scholarly publications and the amount and type of competitive funding Plaintiff had received from external sources. Defendants contend that at the time of his tenure application, Plaintiff had published only two refereed journal articles, and had failed to receive even one competitive grant on his own and based on his individual research as a principal investigator.

Plaintiff argues that there is no minimum number of publications required for tenure and that his research involvement satisfied the tenure requirements. Plaintiff stresses that all external reviewers questioned by the department during the department's review agreed Plaintiff should be tenured.[7] Plaintiff maintains that the decision to deny him tenure was tainted by discriminatory bias, and argues in support that he was treated less favorably than other similarly situated tenure-track faculty members who were "Anglo-Saxon, light[-]skinned, US[-]born applicants."

To meet the similarly situated standard, a plaintiff "must demonstrate that the misconduct for which she was discharged was nearly identical to that engaged in by an employee not within her protected class whom the company retained." *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 221 (5th Cir. 2001) (citations omitted). The "nearly identical" standard is met when "the employees being compared held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, and have essentially comparable violation histories. And, critically, the plaintiff's conduct that drew the adverse employment decision must have been 'nearly identical' to that of the proffered comparator who allegedly drew dissimilar employment decisions." *Lee v. Kan. City S. Ry. Co.*, 574 F.3d 253, 259–60 (5th Cir. 2009).

Plaintiff argues that he was denied tenure despite being at least equal in qualifications to several Caucasian faculty members who were granted tenure and promoted.[8] Plaintiff focuses on

---

[7] The Court notes that Defendants maintain that the research work and grants listed on Plaintiff's tenure application influenced the external reviewers' impressions of Plaintiff, and that Plaintiff's truthfulness concerning some of the research work and grants listed on the application was later called into question. *See* Dep't Head Recommendation [141-6] at 1.

[8] Plaintiff contends that he was treated less favorably than the following faculty members: Dr. J.W. Bruce, Dr. Lori Bruce, Dr. Reese, Dr. Follet, Dr. Donohoe, Dr. Moorhead, Dr. Bryant Jones, and Dr. King. His arguments with respect to Dr. J.W. Bruce are detailed in the text *supra*. His sole argument with respect to Dr. Lori Bruce is that she and her husband, Dr. J.W. Bruce, created a substantial conflict of interest. Plaintiff also argues that Dr.

a comparison between his qualifications and the qualifications of Dr. J.W. Bruce, one of the Caucasian faculty members named by Plaintiff.

Plaintiff contends that Dr. Bruce "created a substantial conflict of interest and the credentials of Dr. Bruce did not measure up to those of [Plaintiff]." Pl.'s Mem. Br. Supp. Resp. Opp'n to Defs.' MSJ [149] at 4. However, the Court finds no factual support for these contentions. First, the record does not support Plaintiff's allegation that Dr. Bruce created a substantial conflict of interest. Second, the record does not support Plaintiff's allegation that Dr. Bruce's qualifications did not measure up to Plaintiff's qualifications.

Both Dr. Bruce and Plaintiff were hired in August of 2000 as assistant professors in MSU's Department of Electrical and Computer Engineering. *See* Pl.'s Tenure Appl. [141-4] at 1; Bruce's Tenure Appl. [141-3] at 1. But an examination into the qualifications of the two reveals little similarities in the three areas of performance reviewed in the tenure application process.

First, Dr. Bruce's teaching evaluations were above-average for MSU, and he was the first assistant professor recipient of the Bagley College of Engineering Outstanding Engineering Educator award. *See* Bruce's Tenure Appl. [141-3] at 13; Pl.'s Dep. [148-1] at 94. Plaintiff's teaching evaluations were average for MSU, and he had not received a comparative award. *See* Pl.'s Dep. [148-1] at 94.

Second, Bruce had eight peer-reviewed, refereed journal publications (many of which were published in Institute of Electrical and Electronics Engineers journals, which the tenure

---

Reese and Dr. Moorhead were granted tenure even though they had no published journal articles and had lesser qualifications than Plaintiff. Finally, Plaintiff argues that his qualifications exceeded those of Dr. Bryant Jones, who Plaintiff claims had a deficient research record. The Court finds little to no competent evidence in the record to support these conclusory allegations and therefore does not consider them in its analysis. A plaintiff's generalized statements about his qualifications or treatment of similarly situated employees is insufficient to defeat summary judgment. *See Ross v. Univ. of Tex. at San Antonio*, 139 F.3d 521, 526–27 (5th Cir. 1998).

reviewers considered well regarded in the field) and twelve refereed, published conference papers. *See* Bruce's Tenure Appl. [141-3] at 8. Plaintiff had two refereed, peer-reviewed journal publications and one additional article that had recently been provisionally accepted for publication, as well as ten refereed, published conference papers. *See* Pl.'s Tenure Appl. [141-4] at 24–25.[9]

Third, with respect to research projects and funding, Dr. Bruce represented on his tenure application that he was principal investigator (100% responsible) on a $44,543 research project and a $3,000 project, a co-principal investigator (33% responsible) on a $299,999 research project, and a co-investigator (4% responsible) on a $8,683,057 research project. Bruce's Tenure Appl. [141-3] at 9–10. Plaintiff represented in his tenure application that he was principal investigator (100% responsible) on a $450,000 research project, a $12,000 research project supplement to that project, a $100,000 research project, and a $10,000 research project; principal investigator (75% responsible) on a $150,000 research project and a $200,000 research project; co-principal investigator (50% responsible) on a $315,375 research project, a $200,000 research project, and a $44,504 research project; a co-principal investigator (6% responsible) on a $101,071 research project; and a co-principal investigator (5% responsible) on an $8,683,057 research project. Pl.'s Tenure Appl. [141-4] at 27–29. Although Plaintiff's research record seems impressive, its accuracy was called into question by the department, and ultimately it was determined that some of the research projects had been misrepresented in the application. The reviewers stated that this weighed heavily in the decision to deny Plaintiff tenure.

---

[9] Plaintiff also argues that Dr. Bruce had only two accepted journal articles and Plaintiff had four accepted journal articles in internationally renowned journals, and that Dr. Harden had "favored Dr. Bruce by counting incomplete magazine articles as researched journals." Pl.'s Mem. Br. Supp. Resp. Opp'n to Defs.' MSJ [149] at 8, 13. The Court finds no evidentiary support for these arguments in the record.

Finally, with respect to service, Dr. Bruce served as a national and sectional officer for the American Society for Engineering Education and as associate editor for the publication *IEEE Potentials*, whereas Plaintiff does not indicate on his application that he had any comparable service positions.[10]

Overall, the Court finds that Plaintiff has not shown that he was denied tenure in circumstances permitting an inference of discrimination. However, the Court recognizes that the Fifth Circuit has stated that the plaintiff "need only make a very minimal showing" to establish a prima facie case. *See Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 41 (5th Cir. 1996). Because this Court is viewing this case at the summary judgment stage, it must view the evidence in the light most favorable to Plaintiff. Assuming, *arguendo*, that Plaintiff has established a prima facie case of discrimination, the Court will move to the next step in the analysis.

### b. Legitimate, Nondiscriminatory Reason for Denial of Tenure

Assuming, *arguendo*, that Plaintiff has established a prima facie case of discrimination, this Court will next examine the second step of the burden-shifting analysis: whether Defendants have expressed a legitimate, nondiscriminatory reason for denying tenure. At this step of the analysis, Defendants have the burden of production, not persuasion. *See Burdine*, 450 U.S. at 254, 101 S. Ct. 1089. Defendants state that Plaintiff was denied tenure because he lacked the record necessary to serve as a tenured professor; specifically, Defendants contend that at the time of his tenure application, Plaintiff had published only two refereed journal articles and had failed to receive even one competitive grant as a principal investigator. *See* Defs.' MSJ [141] ¶¶ 12–14.

---

[10] Plaintiff also argues with respect to Dr. Bruce that due to factions within the department Dr. Bruce was given more research opportunities than Plaintiff, and that Plaintiff was shut out from participating with a research team. The Court addresses this line of arguments in the pretext/mixed motives section in the text *infra*.

With respect to the published articles, Defendants maintain that Plaintiff's production in journal publications and funded research was not consistent with successful tenure and promotion. Defendants contend that Plaintiff's two refereed articles were published in the fall he applied for tenure and promotion, and thus, that Plaintiff had no refereed publications for the first five years he was employed at MSU, suggesting that Plaintiff's research was only in the beginning stages. Defendants further maintain that the reviewers listed two particular concerns with respect to his journal publications: first, that Plaintiff was lead author on only one of his conference papers, and second, that at least one of the journals listed was of questionable quality. *See* Dep't Head Recommendation [141-6] at 2; Dep't Recommendation [141-7] at 2; Harden Dep. [148-5] at 23–24; Shulz Dep. [148-7] at 14.

With respect to the grant issue, Plaintiff stated in his tenure application that he was the principal investigator on a $450,000 grant from the National Science Foundation ("NSF") and also noted on the application that he had assumed control of the project after Dr. Picone left for a sabbatical. *See* Pl.'s Tenure Appl. [141-4] at 15. After the then-provost of MSU investigated the role Plaintiff played in obtaining that grant, the provost determined Plaintiff was not an original principal investigator on the grant, was not involved in obtaining the funding for the grant, and was not in any way identified in the grant application. *See* Rabideau Aff. [141-1] ¶ 17. The Department of Electrical and Computer Engineering Promotion and Tenure Committee noted in its recommendation letter to Dr. Harden, then-department head: "The amounts on two internal center . . . awards were inflated while a large proposal that was not awarded was listed as awarded. In addition, [Plaintiff] listed a submitted proposal for which the University has no record. These facts weighed quite heavily in the evaluation of [Plaintiff's] research performance by the committee." Dep't Committee Letter [141-5] at 1–2. Dr. Harden then wrote in his

recommendation : "From the department head's perspective, it is not possible to credit [Plaintiff] with playing a role in winning the $462,000 in NSF funding listed in [Plaintiff's] application . . . . The only investigator named in these NSF proposals was Dr. Picone." Dep't Head Recommendation [141-6] at 1. Dr. Harden also noted that some proposals and grants claimed were made without departmental approval, and stated other questions concerning Plaintiff's research record. *Id.* Dr. Shulz, then-Dean of the Department of Engineering, wrote in his letter to the provost that "[Plaintiff] was given undue credit for several highly competitive grants from [NSF], which skews his grant application success rate." *See* Dean of Engineering Letter [141-8] at 1.

Although Plaintiff maintains that he was truthful in the application process, he does concede that he was not responsible for obtaining the funding for the NSF grant, was not involved in writing the grant proposal that was funded, and was not the original principal investigator on that grant; instead, Plaintiff was substituted as the principal investigator after the funding had already been awarded, after the original principal investigator took a sabbatical from MSU. *See* Pl.'s Dep. [148-1] at 68–69, 91–92, 97–98. Regardless of whether Plaintiff falsified information or not, the fact that he did not obtain the funding for the sizeable grant likely would have some effect on the assessment of his performance in the research area.

The Court finds that Defendants' proffered reasons for denying Plaintiff's application for tenure and promotion are clear and specific, and thus, that Defendants have met their burden of production and have rebutted the presumption of discrimination. Thus, the burden would next shift back to Plaintiff to show pretext or mixed motives.

### c. Pretext or Mixed Motives

Again, assuming, *arguendo*, that Plaintiff has made a prima facie case and Defendants have sufficiently rebutted this presumption by offering legitimate, nondiscriminatory reasons for the decision to deny tenure, the Court must next examine whether Plaintiff has presented sufficient evidence to create a genuine dispute of material fact that Defendants' proffered reason is merely a pretext for discrimination (the pretext alternative), or that Defendants' reason, while true, is only one of the reasons for the decision, and another motivating factor is Plaintiff's national origin (the mixed-motives alternative). *See Vaughn v. Woodforest Bank*, 665 F.3d 632, 636 (5th Cir. 2011). After a close examination of all the arguments and evidence, the Court finds that Plaintiff has failed to present sufficient evidence to rebut Defendants' proffered reasons for the denial of tenure at the summary judgment stage either in the pretext or mixed motives context.

### Pretext

"An employer's explanation is false or unworthy of credence if it is not the real reason for the employment action." *Burrell*, 482 F.3d at 412 (citing *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003)). In order to raise a genuine dispute of material fact with respect to pretext, the nonmovant must come forward with specific facts; "[c]onclus[ory] allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial." *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002). "Evidence that the proffered reason is unworthy of credence must be enough to support a reasonable inference that the proffered reason is false; a mere shadow of doubt is insufficient." *Daniel v. Universal ENSCO, Inc.*, No. 11–20654, 2013 WL 150110, at *4 (5th Cir. Jan. 15, 2013) (per curiam) (quoting *Bauer*

*v. Albemarle Corp.*, 169 F.3d 962, 967 (5th Cir. 1999) (in turn quoting *E.E.O.C. v. La. Office of Cmty. Servs.*, 47 F.3d 1438, 1443–44 (5th Cir. 1995) (internal quotation marks omitted))).

Although Plaintiff alleges that Defendants' reasons for the denial of tenure were "pretextual and scandalous," Pl.'s Compl. [1] ¶ 10, Plaintiff has presented little to no competent evidence that MSU's decision to deny him tenure was pretext for discrimination. The Court addresses each of Plaintiff's arguments in support of pretext, which appear to be as follows: (1) MSU failed to follow its anti-discriminatory policies with respect to the tenure decision; (2) factions divided Plaintiff's department and led to favoritism which amounts to discrimination; and (3) Plaintiff was denied tenure even though he had favorable annual reviews that indicated he was making adequate progress toward tenure.[11]

First, Plaintiff argues that MSU failed to apply its own anti-discrimination tenure policies when it made the tenure decision, and that this amounts to strong evidence of discriminatory conduct. As support for this claim, Plaintiff argues that Defendants failed to conduct an investigation into his allegations of discrimination, and that Defendants otherwise failed to apply MSU's own anti-discriminatory policies when reviewing his tenure application.

Plaintiff repeatedly argues that no investigation was ever conducted concerning the alleged discrimination, and that this was in violation of MSU's articulated non-discrimination and anti-harassment policy, which calls for an investigation into any allegations of discrimination. Defendants maintain that an investigation was performed that included interviews with Plaintiff, the department head, the college dean, and others, and that MSU

---

[11] The Court notes that Plaintiff additionally argues he was treated discriminatorily by MSU with respect to his request for a one-year extension to apply for tenure in that this issue was allegedly never resolved. MSU maintains that any requests for extension of probationary period are resolved one way or the other when the request is received at the university's discretion. Also, Dr. Shulz, former Dean of the Department of Engineering at MSU, testified in his deposition that when Plaintiff mentioned he wanted an extension, Dr. Shulz responded to Plaintiff that his request for extension needed to be officially submitted in writing and that MSU never received an official extension request from Plaintiff. The Court finds that this argument does not have a bearing on the case, as Plaintiff has not connected the alleged treatment of his request with any alleged discrimination.

determined from the investigation that there was no discriminatory basis for Plaintiff's appeal. Defendants further maintain that Plaintiff cannot demonstrate any damage or harm resulting from MSU's alleged failure to perform such an investigation and that MSU's policy by its own terms is not intended to address differences in opinion regarding the validity of employment decisions such as promotion and tenure. The Court finds Plaintiff's argument unavailing, as Plaintiff has presented no evidence to support that no investigation was performed, aside from conclusory allegations, which do not satisfy the summary judgment standard for pretext.

Plaintiff additionally argues that MSU otherwise failed to apply its anti-discriminatory policies in the review of Plaintiff's tenure application. In support of this, Plaintiff presents deposition testimony from Dr. Kirk Shulz, then-department dean, who testified that he had told the provost: "[Y]ou may deem that this case has been badly handled by the department and college." Pl.'s Mem. Br. Supp. Resp. Opp'n to Defs.' MSJ [149] at 4; *see* Shulz Dep. [148-7] at 46.

Defendants maintain that among the reviewers of Plaintiff's tenure application were minorities and persons of different national origins, and that the decision to deny Plaintiff tenure was based on Plaintiff's deficient research record. Defendants contend that MSU follows the same procedure with all tenure applicants regardless of race or national origin, and as support for this, cites the fact that subsequent to the denial of Plaintiff's tenure application, another faculty member of MSU, Dr. Yaroslav Koshka, a native of Ukraine and native Russian speaker, applied for early promotion to associate professor and was granted this promotion after being evaluated by the same committees that evaluated Plaintiff. *See* Defs.' Mem. Supp. MSJ [143] at 22 n.17.

The Court finds that Plaintiff has produced little to no evidence that Defendants applied any other policy or practice with respect to Plaintiff than it would with any other tenure

applicant. What evidence has been presented tends to show that the review of Plaintiff's tenure application was an exercise of professional judgment, not of discriminatory intent. Thus, the Court finds that this argument does not support that Defendants' denial of his tenure application was pretext for discrimination.

Second, Plaintiff argues with respect to pretext that factions or cliques divided his department and resulted in "turmoil" and favored treatment for others in the department besides Plaintiff. Plaintiff maintains that one faction included Dr. Harden, then-department chair; Dr. Bruce, a faculty member; and Dr. Shulz, then-department dean. According to Plaintiff, the other faction included Dr. Molen, the former department chair; and Plaintiff. Plaintiff maintains that the existence of these factions led to decreased research opportunities for Plaintiff, his exclusion from a research project, and finally to Plaintiff's research funding being cut off. Although Plaintiff's allegations concerning the existence of factions or cliques in the department may indeed be accurate, the Court finds Plaintiff has failed to present sufficient evidence to connect these allegations to any alleged discrimination. To this Court, Plaintiff's allegations strongly suggest that if factions or cliques existed in the department, they were drawn along lines of differing ideas on the research function—not along lines of race or national origin. Therefore, the Court finds that Plaintiff has failed to show how the alleged existence of factions or cliques was evidence of pretext, and further has failed to show how any alleged favored treatment in the department was motivated by any discriminatory animus.

Third, Plaintiff argues that his annual reviews verified his credentials and supported that he was qualified for tenure, and thus, that the decision to deny him tenure was based on discriminatory animus. The Court has carefully reviewed all annual reviews and other documentation submitted in this respect and finds that it was consistently noted in Plaintiff's

annual reviews during his probationary years that his research funding and publication record was deficient and that Plaintiff should focus on publishing and improving in this area. *See, e.g.*, 2001 Annual Faculty Review [142-3] at 9 ("[Plaintiff] has agreed to give the publication of journal/transaction papers a very high priority.") and 10 ("Good start. Focus on publishing."); 2002 Annual Faculty Review [142-4] at 12 ("[Publishing] is an area that needs improvement.") and 13 ("Focus on sponsored research and journal publications[.]"); 2003 Annual Faculty Review [142-5] at 16 ("[Plaintiff] needs to publish refereed journal papers and gain external support for his research program in order to gain tenure."); 2004 Annual Faculty Review [142-6] at 21 ("As in the past, we strongly underline the need to increase journal publications and gain funded research."); *see also* Dep't Head Recommendation [141-6] at 2. Thus, Plaintiff was made aware during the tenure probationary period that his research program was not sufficient to meet the requirements for tenure.

Overall, the Court finds no evidence that Plaintiff's colleagues did not face similar pressures in their efforts to attain tenured positions, nor is there any evidence that, having failed to meet this requirement, Caucasian assistant professors were nonetheless granted tenure. Although Plaintiff's version of the facts differs in some respects from Defendants' version of the facts, it takes more than that to create a genuine dispute of fact with respect to pretext. *See LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 391 (5th Cir. 2007) ("simply disputing the underlying facts of an employer's decision is not sufficient to create an issue of pretext"). The "existence of competing evidence about the objective correctness of a fact underlying a defendant's proffered explanation does not in itself make reasonable an inference that the defendant was not truly motivated by its proffered justification." *Little v. Republic Refining Co.*, 924 F.2d 93, 97 (5th Cir. 1991) (internal citation omitted).

Thus, Plaintiff has presented little, if any, "competent evidence that the presumptively valid reasons for [the denial of tenure] were in fact a coverup for a . . . discriminatory decision." *See McDonnell Douglas*, 411 U.S. at 805, 93 S. Ct. 1817. Accordingly, the Court concludes that Plaintiff's evidence is insufficient to raise a genuine dispute of material fact as to whether Defendants' proffered reasons for their actions were pretext for unlawful discrimination.

Mixed Motives

Lastly, the Court considers whether Plaintiff has raised a genuine dispute of material fact that, while Defendants' proffered rationale for its employment decision is true, the proffered rationale is only one reason for its decision, and another motivating factor for the decision was Plaintiff's race or national origin. The Court finds that Plaintiff has failed to show that Defendants intentionally discriminated against him, and thus, his case fails even if considered in the mixed motives context.

### D. Conclusion

In sum, the Court finds that Plaintiff has presented insufficient evidence that unlawful discrimination played any role in MSU's decision to deny Plaintiff tenure; that MSU presented legitimate, nondiscriminatory reasons for the denial of tenure; and that Plaintiff has not met his burden with respect to pretext or mixed motives. Accordingly, Defendants' motion for summary judgment [141] is GRANTED; the parties' joint motion for extension of time to submit disputes regarding deposition designations [165] is DENIED as moot; and Plaintiff's case is DISMISSED WITH PREJUDICE.

A separate order in accordance with this opinion shall issue this day.

THIS, the 14th day of February, 2013.

Sle H. Davidson
SENIOR JUDGE

22